SHAW and others *v.* LEAVITT, Receiver &c., and others.

W. being indebted to E. and desiring forbearance, procured N. to advance his securities to E. for the amount, and W. gave to N. his bond for the same sum and transferred divers effects to N. The bond recited the transfer of the latter, and stated it as being to secure the bond. With the bond, the transfer and the effects W. delivered to N. a letter, giving a history of the transaction, and stating that the effects were transferred to be held in trust for the payment of N.'s securities to E. The letter was accepted without objection, and it conformed to the verbal arrangement.

*Held,* 1. That the transfer by W. to N., the bond, and W.'s letter, were to be construed together, as if their terms had been brought into one instrument, executed by the parties.

2. That the letter does not conflict with or detract from the bond, or diminish its force; although both derogate from the absolute terms of the transfer executed to N.

3. That the letter is admissible to prove a consideration for W.'s transfer, other than that mentioned in the bond.

4. That it was competent for W. to file a bill against N. and E., to secure from loss, the property assigned to N., and for an account.

The case of *Leavitt* v. *Tylee,* 1 Sand. Ch. R. 207, confirmed.

September 4, 5, 6; December 30, 1845.

THE bill was filed on the 9th day of September, 1842, by Gabriel Shaw, Fletcher Wilson and Melvil Wilson, merchants of the city of London, trading while in business, under the firm of Thomas Wilson & Co., against David Leavitt, Receiver of The North American Trust and Banking Company, Thomas G. Talmage, Richard M. Blatchford, and The Governor and Company of the Bank of England.

The case established by the pleadings and evidence was as follows:

The complainants in June, 1837, suspended payment, being

largely indebted to various persons and bodies corporate. They negotiated with their creditors, and a payment of thirty-three and one-third per cent. was finally agreed upon, which was to be made on the 28th of September, 1838. On that day they were indebted to the Bank of England, for such per centage, £63,544 5s. 3d., for money lent to them on bills of exchange and promissory notes then in the possession of the bank. An extension of time was arranged between Wilson & Co. and the bank, on condition that the future payment should be secured by the certificates of deposit of The North American Trust and Banking Company, a banking association in the city of New York. The latter entered into the arrangement, and it was carried into effect. The complainants conveyed and transferred to the North American Trust and Banking Company, property in the United States, amounting according to its scheduled value to $439,295 51, and actually worth as then estimated, more than three hundred thousand dollars; which was to be a security to the Banking Company for the complainant's bond hereafter mentioned, and to the Bank of England, for the payment of the certificates of the Banking Company. The latter issued their certificates of deposit for £64,868 2s., payable to the order of the complainant Shaw, in the city of London, two years after their date, with interest at the rate of five per cent. The bond and certificates were dated February 28th, 1839, but were not delivered until about the 13th of April, 1839. The certificates of deposit, after being indorsed by Shaw, were delivered to the Bank of England, and the payment of the dividend to the latter was postponed thereby.

The bond delivered by the complainants to The North American Trust and Banking Company, was executed by Gabriel Shaw and Melvil Wilson, in the penalty of six hundred thousand dollars, with a condition in the usual form, for the payment of sixty-four thousand, nine hundred and fifty pounds, two shillings and four pence, sterling money of Great Britain, or the value thereof in coin current, according to the rate of exchange at the time of payment between New York and London, on or before the 28th day of October, 1840, with interest thereon at the rate of seven per cent. half yearly, in the city of New York. Imme-

diately following the preceding condition, and forming a part of it, was a clause in these words, viz.: "As collateral security for the payment of which bond, we have transferred to the said obligee certain bonds, mortgages, stocks, promissory notes, and other securities particularly mentioned and described in the schedule hereto annexed, marked A. And we do hereby authorize him, or his successor or assigns, to sell the same or any part of the same, in default of payment of the said principal sum or the interest to grow due thereon according to the terms thereof. And if the net proceeds arising from such sale be insufficient to pay the said principal sum of money with all interest due, then we are to pay to the said President of the North American Trust and Banking Company, his successor, or assigns, forthwith after such sale, the amount of such deficiency with interest thereon, at the rate of seven per centum per annum."

All the conveyances and assignments of the property and effects referred to in the bond, made by the complainants to The North American Trust and Banking Company, were absolute and unconditional in their terms. But with the securities assigned, the transfers and conveyances, and the bond of Shaw and M. Wilson, Mr. Shaw delivered to the Banking Company an instrument in the form of a letter addressed to Joseph D. Beers, the President of the Company, which was as follows:

"NEW YORK, 13th April, 1839.

SIR:—Thomas Wilson & Co. intending last August to pay a dividend of thirty-three and a third per cent. in London on all their debts and liabilities; the Bank of England then consented to postpone the receipt of the same on the notes and bills held for their account, by the Bank of the United States with the endorsement of Thomas Wilson & Co., it being understood that such dividend was to be secured to the satisfaction of John W. Cowell, Esquire. Payment of this dividend was commenced on or about the 28th of September last, and the bills and notes referred to, now in the Bank of the United States for collection, are assumed to be, . . . . . . . £190,632 15 9

One-third of which amount is, . . . £63,544 05 3

|  |  |
|---|---|
| Amount brought over, | £63,544 05 3 |
| The interest thereon at the rate of five per cent. per annum, from the 28th September to 28th February, being . . . | 1,323 16 9 |
|  | £64,868 02 0 |

For this amount I have received from you for deposit in the Bank of the United States, as by my letter of this date to Thomas Dunlap, Esquire, President, the sterling certificates of your company, dated the 28th February last, payable two years after date, and bearing interest at the rate of five per cent. per annum. As the said bills and notes shall be taken up or retired by the parties primarily responsible, or by any other parties; or when it is ascertained that any of them have been taken up or retired, so as to remove the responsibility of Thomas Wilson & Co. thereon respectively to the Bank of England, it is provided that thirty-three and a third per cent. on the amount of the said bills and notes, which shall have been so settled, with five months interest thereon at five per cent. per annum, shall be returned to you by the Bank of the United States in your said sterling certificates.

I hand you moreover, as per schedule accompanying these presents, securities which we have received as equal to four hundred and thirty-nine thousand, two hundred and ninety-five dollars, fifty-one cents; but which I estimate for our present purpose, as only three hundred and sixteen thousand and ninety-two dollars, fifty-one cents.

It is understood, that as your certificates are returned to you by the Bank of the United States, you are to return to me an approximate amount of the securities deposited with you at the lowest estimated value. And the amount of these securities which you cannot conveniently give me at one time of settlement, I am to have credit for in the next, and so on, till the whole of your certificates be returned to you, and the whole of the said securities be returned to me.

It is further understood, that in making these settlements for certificates that have been returned to you, and for securities which may be returned to me, we will consider any rise or fall in

the price of the latter which may have occurred, and make due allowance for the same.

For reasons which will be obvious to you, it is of the highest importance to Thomas Wilson & Co. to be able to command their funds as far as may be proper ; and that we should be at liberty from time to time, to change the securities in your hands, substituting others to your satisfaction. But as it is an operation into which you entered to serve Thomas Wilson & Co., and not with a view to profit, it is very properly required by you, and agreed to on my part, that you should always be on a footing of perfect security.

The instructions of Mr. Cowell, not allowing him to sanction this arrangement, the Bank of England are to have the right at any time within three months to repudiate the same, it being understood, that in the event of such repudiation the whole of your sterling certificates, then in the hands of the Bank of the United States, are to be returned to you, and the whole of the securities not deposited with you, are to be returned to me or duly accounted for.

It is of course, understood, that the securities now pledged to you, or such as may be hereafter pledged in lieu of them, and the proceeds of such securities are specially appropriated, and held by you for the payment and redemption of the certificates received from you, amounting to sixty-four thousand eight hundred and sixty-eight pounds, two shillings. I am aware that it is unnecessary to refer to the special appropriation of the securities ; such being your system in all cases of deposit in trust, but I make it a condition of the present deposit, for the satisfaction of those parties concerned, who may not be acquainted with that system.

It is understood, that pending this operation, we will calculate from time to time, the interest which may have arisen on the sterling certificates received from you, and make such deposit on account of interest as may be requisite.

I am Sir with great respect,<br>Yours very faithfully,<br>GABRIEL SHAW.

With respect to the securities deposited, which may be con-

sidered of a fluctuating value, you 'will observe on reference to the schedule that they are taken at only $161,439, though the original cost or valuation was $284,642.

                                                    GABRIEL SHAW."

The transaction was discussed and considered a long time before its terms were agreed upon. Mr. Shaw desired to have the bond contain the provision that the securities and effects were to be appropriated and held by the banking company, for the payment and redemption of their certificates of deposit; but this was opposed by the committee of the banking company, and at length Shaw yielded the point, on the suggestion of their counsel, that a letter written and delivered as before stated, would have the same operation and effect.

The letter was prepared and delivered accordingly. The securities and other papers received on this occasion, from T. Wilson & Co., were put in a trunk and kept by themselves; and were not placed in the same depositories or accounts, as the assets of the banking company in its ordinary business. The officers of the company, understanding such to be the agreement when they were delivered, suffered Melvil Wilson to withdraw some of the securities and to substitute others in their place.

The company in the course of 1839 and 1840, collected from those securities $20,500, and instead of redeeming their certificates of deposit with the Bank of England, applied the collections to their own affairs. Wilson obtained a settlement of these collections, and on the complainants advancing $25,000, to the banking company, the latter furnished to Wilson new certificates of deposit for $45,500, for such loan, and the misappropriated collections. The certificates for $45,500, were secured by a transfer of mortgages by the banking company, to Henry Yates and others in trust, and usually denominated the Yates Trust.

The banking company never paid any of their certificates delivered to the Bank of England, except eight, in all amounting to £4301, 8s. 8d., which the complainants claimed to have paid; and the residue were still with the Bank of England.

On the 26th or 27th of August, 1841, The North American

Trust and Banking Company, with the complainant's assent, conveyed and transferred all the collaterals remaining in their hands so received on issuing their certificates of deposit, to Thomas G. Talmage, and Richard M. Blatchford, in trust to hold the same until the one hundred and twenty-six certificates then in the Bank of England, should be returned from London and delivered to the company, and then to transfer the property to the Bank of England.

At this time the company was insolvent, a bill to wind up its affairs was already prepared, and had been, or was about to be served on its president, with notice of a motion for an injunction and the appointment of a receiver. The motion was made and the injunction and receiver granted by the Chancellor, on the 30th day of August, 1841. The defendant Leavitt, was appointed receiver of the company, under that order, and on the 20th of October, 1841, the officers of the institution assigned to him all its property and effects.

The Bank of England forwarded the one hundred and twenty-six certificates to Blatchford, who offered to deliver them to Mr. Leavitt, on receiving a transfer of the collaterals, assigned and conveyed to the banking company, by Thomas Wilson & Co., but Leavitt declined to comply.

The bill charged that those certificates were worthless and void, for all the purposes for which they were taken, and did not render the company liable. It prayed that Blatchford and Talmage, might convey and transfer to the Bank of England, all the remaining property which Thomas Wilson & Co. assigned to the banking company, and account for what they had collected and received.

Mr. Leavitt in his answer, insisted that the conveyance and transfer to Talmage and Blatchford, was illegal and fraudulent, and vested no estate or title in them. He claimed in any event, to have a lien on the property for the bond of Shaw and Wilson, to the extent of all moneys paid or advanced by the company, on the certificates, and the reasonable charges and expenses in respect of the same.

Blatchford and Talmage put in an answer, and submitted to

account and transfer the securities, under the direction of the court.

*George F. Allen,* for the complainants.

*George N. Titus* and *M. S. Bidwell,* for D. Leavitt, Receiver, &c.

THE ASSISTANT VICE-CHANCELLOR.—It is clear that the complainants cannot uphold the title of Messrs. Blatchford and Talmage to the property in question, under the assignment and conveyance dated August 25, 1841. That transaction was so similar in its circumstances, to the one emanating from the same institution, which was before me two years since, in *Leavitt v. Tylee,* (1 Sand. Ch. R. 207,) that I need only refer to my opinion then pronounced, and to say that the grounds of the decree in that suit, are decisive against the transfer to these parties.(a)

Independent of that transfer, the controversy may be thus stated :

The complainants were indebted in a large sum to the Bank of England, of which £63,544 5s. 3d. sterling, was payable in the fall of 1838. They had a large amount of property in this country consisting of commercial paper, stocks and lands; but it was not convertible into money in season to meet their payment to the Bank of England. After a negotiation with the North American Trust and Banking Company, the complainants in April, 1839, transferred and conveyed to that company, property and securities, principally in this city, which were scheduled at nearly $450,000, and estimated to be worth more than £64,000 sterling. Two of the complainants gave their bond to the same company, for £64,950 10s. 4d. sterling, payable on the 28th day of October, 1840, with interest at seven per cent., half yearly.

---

(a) A like decision was made in *Leavitt v. Griffin,* March 12, 1846, by the Assistant Vice-Chancellor ; setting aside a similar transfer made by the North American Trust and Banking Company, for the benefit of James Holford and The Real Estate Bank of Arkansas.

On the other hand, the North American Trust and Banking Company, executed and delivered to the complainants, the company's certificates of deposit, for £64,868 2s. sterling, payable to Gabriel Shaw or order, in London, two years after date, with interest at five per cent. These certificates as well as the bond, bear date February 28th, 1839. The certificates were indorsed by Mr. Shaw and delivered to the Bank of England, as a security for the sum due to the latter in 1838, the payment of which was thereupon respited to the complainants.

The North American T. and B. Company failed to pay their certificates, and having become insolvent, went into hands of a receiver in September, 1841; and such of the assigned property as had not been converted by the company, became vested in Mr. Leavitt, the receiver. The bond executed by two of the complainants, has not been paid, and is held by the receiver.

So far, I believe there is no dispute as to the facts. The complainants further allege that the property which they made over to the company, was a collateral security for the payment of their bond, and also for the payment of the company's certificates to the Bank of England. The receiver agrees that the transfer of the property was made as a security, but it was only a security for the payment of the bond to the company. This difference forms the great point in the cause.

I have stated enough of the case to show that the receiver is not correct in his first point, in which he in effect demurs to the bill. If the complainants establish their allegations by competent testimony, they will show an interest which fully entitles them to relief. It is true the Bank of England holds the certificates, but the complainants are the party who is to be the loser if the certificates are not paid. They are liable to the bank for their original debt, as well as by Mr. Shaw's indorsement, and they have a right to enforce the proper application of the property transferred, as a fund for the discharge of those certificates. The Bank of England, as the holder of the certificates, is a proper party defendant. The bank might have been a complainant; but its choice to remain passive, cannot prevent the complainants, also having an interest, from proceeding for its protection.

Before looking into the testimony relative to the disputed fact

arising upon the complainants' transfer, I must dispose of the serious objection which was so forcibly urged against the testimony, introduced by the complainants to support their position.

The receiver insists, that the contract between the parties, is expressed in the bond which he holds; and that the complainants' testimony being by parol, and offered for the purpose of altering, varying and enlarging the terms of such contract, is wholly inadmissible.

The conveyance and transfer of the property by the complainants, were in their terms, absolute and unconditional. They express no trust, nor have they any reference to either the bond or the certificates of deposit. Both parties concur in declaring that they do not express the true nature of the transaction. Both the complainants and the receiver agree that the property was transferred as a collateral security, and that the surplus belonged to the complainants. The receiver produces a bond, signed by two of the complainants, which recites under their seals, that the property was transferred to secure its payment. The complainants prove in the custody of the receiver, a cotemporaneous writing signed by one of the two complainants who executed the bond, which declares that the property was transferred as a security for the bond and the certificates also. One of the complainants is not a signer of either of these instruments. The North American Trust and Banking Company, did not execute either of them, and they are parties to them only by accepting them. The writing signed by Mr. Shaw, was delivered to the company with the bond and the securities, and there is no evidence that it was ever returned or repudiated.

Why is not the writing, just as competent evidence to show the defeasance upon which this property was transferred, as the recital in the bond? I mean, on the assumption that it was equally known and understood by the company. On that assumption it appears to me, that the transfers, the bond, and the letter of Mr. Shaw, are all to be construed together, as if their terms had been brought into one instrument, executed by both parties. Both the bond and the letter, derogate from the absolute terms of the transfers to the company. But the letter does not detract from the terms of the bond, or diminish its force. The company, with

the letter engrafted upon the bond, might sue and collect it when it was due, precisely as they could do if the letter did not exist.

The letter therefore, does not conflict with or contradict the bond. It avers another object for which the property was transferred, as security, which may stand with the object expressed in the bond.

Parol evidence has been held admissible for nearly 300 years past, to show a consideration not mentioned in a deed, provided it be not inconsistent with that which is expressed. ( *Villers* v. *Beamont*, Dyer's R. 146, a; *Clifford* v. *Turrell*, 1 Y. & Coll. Chy. Ca. 138; and 6 Lond. Jur. Rep. 5; *S. C. on Appeal*, 9 Lond. Jur. R. 633.)

In this view, the letter would be competent, yielding to the bond the force of a contract between the parties relative to the property.

I have mentioned that the bond was not executed by the company. Hence its force as a contract, in respect of this property, rests on its delivery to and acceptance by the company.

Suppose that the property had produced its valuation, or $120,000 more than the amount of the certificates of deposit ; and the complainants had filed a bill for an account of the surplus, to which the company had answered, denying their right and insisting on the absolute terms of the transfers of the property. Would not proof of the delivery of Mr. Shaw's letter, with those transfers, and its acceptance by the company, establish the complainant's right to the surplus ? It would, undoubtedly, in my judgment. And if so, it is evidence of the contract between the parties, standing upon the same footing in that behalf as the bond. Next as to the question of fact.

The agreement between the complainants and the company, was made by a committee of the latter, and it is proved to my entire satisfaction, that a part of the agreement was that the property should be held as an indemnity to the Bank of England, and the complainants, for the redemption of the certificates of deposit.

This is the substance of Mr. Shaw's letter. Mr. Graham testifies that it was the understanding, and he explains that it was his objection to having it appear in the bond, which led to its omission there, and the substitution of the letter, as equally oper-

ative for the complainant's protection. Mr. G. was associated with the special committee, charged with this negotiation and was a member of the finance committee, which directed the acceptance of Mr Shaw's proposition ; and he had the entire charge of perfecting the execution and delivery of the written instruments by which it was consummated.

Mr. Beers, who it is claimed, proves a different state of things, was the president of the company. But he was not a member of either of those committees, and had only a general knowledge of the transaction. He is clearly mistaken, when he says that Mr. Shaw's letter was sent in after the transfers were made. And it is probable that his idea, that the property was security for the bond only, came from his knowledge that there was an objection made and persisted in, to having the bond express any thing more, while he was ignorant of the mode in which Mr. Shaw's object was attained. His views of a trust in relation to that property, show that his mind was impressed with the existence of something beyond the terms expressed in the bond. And finally, contrasting his means of knowledge and his connection with this affair, with those of Mr. Graham, there can be no hesitation in adopting the statements of the latter as the most reliable evidence. There is really no conflict of evidence. The one understood and recollects, what the other either did not know or does not remember.

The other testimony confirms the version of the affair given by Graham. The proof is positive, that Mr. Shaw's letter was delivered to Graham when the securities and property were transferred, and went with the transfers into the vaults of the company. Its delivery to Mr. Graham with the securities, was a sufficient delivery to the company ; but in addition, the indorsement upon the letter, shows that it came to the notice as well as the hands of the cashier of the company, on his receiving the transfers and securities. If the letter were repugnant to the agreement, it ought to have been returned, or the fact notified to Mr. Shaw. Neither was done, and the silence of the officers of the company must be deemed evidence that the letter expressed the agreement. The subsequent dealings of the company with the securities, confirm this inference. They were kept separate

from the assets of the company.  The commercial paper was not treated as the company treated their discounted bills and notes. The complainants were permitted to withdraw and substitute securities, as is provided in Mr. Shaw's letter, and which is not expressed in the bond.  And when the company were brought to an account for $20,500, of the collaterals which they had collected and omitted to apply in redeeming their certificates of deposit, they gave their obligations for the amount, instead of indorsing it as a payment on the complainant's bond, which was the natural and obvious mode of settling the $20,500, if the securities were collateral to the bond alone.

The question as to the legality of the certificates of deposit, was argued, but I deem it unnecessary to decide it.  The receiver insists, that the complainants are not at liberty to set up the objection that the certificates were illegal or void ; and that the point is not properly presented by the pleadings.

The bill does not allege that they were *illegal*, or contrary to law, but simply that they were void and did not subject the company to any liability.  This might be because of an excess of power in issuing them ; and does not involve any violation of positive law in which the complainants participated.  It therefore does not prevent the complainants from relying upon the void nature of the consideration which they received, for the transfer of their property to the company.  But whether void or valid, is indifferent to the complainants, if the property be applied for their redemption.

Another point is made in respect of the post notes of the company given on the settlement for the $20,500, collected out of the assigned securities.  It does not appear to be necessary for me to decide this question.  Assuming for the argument, that the receiver is right, and the post notes were void and illegal ; the whole transaction is void, and the company stands liable for the money collected and misapplied.  To that extent, as a transaction growing out of the transfer of the securities, I think the complainants are entitled in this suit to be declared creditors of the company.

The loan of $25,000 accompanying this arrangement does not necessarily enter into the controversy about the property assigned

and conveyed in 1839. And as the validity of all these post notes, constituting what is usually called the Yates trust, has been fully argued, and is under advisement in another branch of the court; I prefer not to pass upon it in this case.

The complainants are entitled to a decree for the transfer of the remaining property to themselves or the Bank of England, on delivering up the certificates of deposit which are outstanding. The sum paid by the company in redemption of their certificates, should be offset against the sum collected by them out of the securities transferred. For the balance, if against the company, the complainants, or the Bank of England, will be declared creditors. And if the balance be in favor of the company, it must be paid to the receiver, by the complainants. The questions arising upon the Yates trust post notes for the $25,000, must be reserved.

As to costs, each party must bear their own. The receiver did right in respect of his trust, to defend the suit, and that trust must re-imburse him. I perceive no ground upon which he can be allowed costs against the complainants, or which is the same thing, out of the fund in question. He is not the trustee of that fund, and the cases cited by his counsel, were those where the trustee, acting for the protection of his trust, was allowed costs out of such trust.